acquires any such Additional Senior Notes (or other claims or interests) after the date hereof, such Additional Senior Notes (and any other claims or interests) shall immediately upon such acquisition become subject to the terms of this Agreement. Noteholder shall promptly notify the Company of such acquisition, and Noteholder agrees to execute and deliver within five business days of the closing of such acquisition any additional documents that the Company shall reasonably request to evidence that such Additional Senior Notes are subject to the provisions of this Agreement as of the date of acquisition.

(xv)    No Transfer. Noteholder hereby agrees that, without the prior written consent of the Company, it will not directly or indirectly (a) sell, transfer, assign, pledge, grant an option on, or otherwise dispose of any of the Noteholder's Senior Notes, or (b) grant any proxies, deposit any of the Noteholder's Senior Notes into a voting trust or enter into a voting agreement with respect to any of the Noteholder's Senior Notes, unless such transferee or other entity agrees in writing (i) to be bound by the terms of this Agreement and (ii) that, if such transfer is to occur prior to the deadline established in the Disclosure Statement for casting votes on the Plan, as such deadline may be extended, such transferee or other entity or Noteholder, as the case may be, shall execute and deliver to the Company's voting agent, in accordance with the voting procedures established in the Disclosure Statement, a Ballot indicating acceptance of the Plan; provided that, in any case, such agreement shall expressly provide that the Company is a third party beneficiary to such agreement and all of the terms provided therein. Any sale, transfer or assignment of any Senior Note that does not comply with the foregoing shall be deemed void *ab initio.* Noteholder further agrees not to acquire any additional common stock of the Company to the extent that as a result of such acquisition of common stock Noteholder would own, control, or have the power vote 20% or more of the outstanding common stock of the Company.

(xvi)    Independent Due Diligence and Decision-Making. Noteholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation, with, as applicable, the assistance of professional financial and legal advisors of its choosing, of the operations, business, financial and other conditions and prospects of the Company. To the extent any materials or information have been furnished to it by the Company, each Noteholder hereby acknowledges that such materials or information has been provided for informational purposes only, without any representation or warranty (other than any representations or warranties contained herein). Each Noteholder hereby further represents that it has reviewed the Plan, or has had the opportunity to review the Plan, with the assistance of professional financial and legal advisors of its choosing.

(xvii)    Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. This Agreement shall not be amended, altered or modified in any manner whatsoever, except by a written instrument executed by the parties hereto.

(xviii)    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the provisions thereof relating to conflicts of law, other than Section 5-1401 of the General Obligations Law of the State of New York).

(xix)    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR

RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(xx)    Remedies.  The parties hereto acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the parties hereto agree that  each party shall be entitled to the remedy of specific performance and injunctive or other equitable relief without the necessity of proving the inadequacy of money damages as a remedy or posting a bond or other security in connection with such remedy.

(xxi)    Jurisdiction.  The Company and Noteholder each hereby irrevocably and unconditionally submit to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City or any court presiding over a Chapter 11 case of the Company, and any appellate court thereof, but solely in any action or proceedings to enforce this Agreement.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  During the pendency of the Bankruptcy Case, the Company and Noteholder irrevocably and unconditionally consent to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated thereby.

(xxii)    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts and by facsimile, with the same effect as if all parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument.

(xxiii)    Severability.  Any term or provision of this Agreement, which is invalid or unenforceable in any jurisdiction, shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

(xxiv)    Headings.  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

(xxv)    Prior Negotiations.  This Agreement supersedes all prior negotiations with respect to the subject matter hereof but shall not supersede the Plan.

(xxvi)  <u>Notice</u>.  Any notices or other communications required or permitted under, or otherwise in connection with, this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person or upon confirmation of receipt when transmitted by facsimile transmission (but only if followed by transmittal by national overnight courier or hand for delivery on the next business day) or on receipt after dispatch by registered or certified mail, postage prepaid, or on the next business day if transmitted by national overnight courier, addressed in each case as follows:

(a)     To the Company at:

Russell-Stanley Holdings, Inc.
685 Route 202/206
Bridgewater, New Jersey  08807
Attention:     Ronald M. Litchkowski
                     Elizabeth G. Miller
Telephone:  (908) 203-9500
Facsimile:  (908) 203-1944

*with a copy to:*

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York  10036-6522
Attention:     Kayalyn A. Marafioti
                     Frederick D. Morris
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

and

Greenbaum, Rowe, Smith & Davis LLP
Metro Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095-0988
Attention:     W. Raymond Felton
Telephone:  (732) 549-5600
Facsimile:  (732) 549-1881

(b)     To the Noteholder at the following adddress (in addition to any address provided on the signature page hereto):

[•]
[•]
Telephone:   [•]
Facsimile:    [•]

(*Last Page before Signature Page*)

7

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

RUSSELL-STANLEY HOLDINGS, INC.


By: _____

     Name:
     Title:


Accepted and Agreed to:

Name of Noteholder:


_____


By: _____

    Name:
    Title:

Address:       _____
                     _____
                     _____

Telephone:   _____
Facsimile:    _____


| Security | Amount |
| --- | --- |
| 9% Senior Subordinated Notes due 2008 | $_____ |
| Common Stock | _____ |


Held as follows:

| Amount/Security | Registered Holder | Custodian |
| --- | --- | --- |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

APPENDIX E

TO

DISCLOSURE STATEMENT
OF RUSSELL-STANLEY HOLDINGS, INC. AND ITS AFFILIATE DEBTORS

ESTIMATION OF RECOVERY ANALYSIS

**Russell-Stanley Holdings, Inc.**
**Estimated Recovery Analysis**[1][2][3]

*($ in millions)*

**Total Proceeds to be Allocated:**

| | |
|---|---:|
| Purchase Price[4] | $96.4 |
| Projected Cash Balance[5] | 6.4 |
| Projected Cash Flow[6] | 2.8 |
| Total Proceeds to be Allocated | $105.6 |

**Allocation of Proceeds:**

| | |
|---|---:|
| Secured Claims[7] | (76.0) |
| Transaction Expenses and Administrative Claims[8] | (6.9) |
| Taxes[9] | (1.9) |
| Allentown Lease | (1.7) |
| General Unsecured Claims and Contingency Costs[10] | (5.0) – (1.0) |
| **Estimated Proceeds Available for Distribution to Bondholders** | **$14.1 – $18.1** |
| **Estimated Percentage Recovery for Bondholders (Excluding payment-in-kind interest)** | **70% - 90%** |
| **Estimated Percentage Recovery for Bondholders (Including payment-in-kind interest)** | **51% - 66%** |

**Notes to Estimated Recovery Analysis**

1.  This analysis estimates one possible distribution scenario to bondholders of Russell-Stanley Holdings, Inc. ("RSH"). It is based on numerous assumptions including the nature and amount of claims to be filed and could prove inaccurate.

2.  No assumptions are made as to the timing of recoveries or distributions.

3.  It is assumed that the Company maintains customary working capital relationships during Chapter 11 and ancillary Canadian proceedings, including ordinary credit terms from trade creditors.

4.  Assumed purchase price of $96.4 million is subject to certain purchase price adjustments, including a post-closing net working capital adjustment if working capital on the closing date is less than $14.0 million or greater than $16.0 million.

5.  Unrestricted cash balance plus CMS cash escrow balance of $875,000 as of June 1, 2005. At June 30, 2005, the unrestricted cash balance plus CMS cash escrow was $5.8 million.

6.  Projected cash flows generated by RSH from May 31, 2005 through the estimated date of consummation of the Plan.  A consummation date within 60 days of the estimated date of consummation of the Plan is not expected to impact the estimated recoveries to RSH's bondholders in a materially negative manner.

7. Secured claims include the Company's approximately $76.0 million of senior secured debt, including the Canadian portion of that facility, as of May 31, 2005.

8.  Transaction Expenses are based on negotiated professional fees or on reported time charges, as applicable, and include estimates of charges from June 2005 through January 2006.

9.  Taxes include estimates of relevant U.S. federal and state income taxes, as well as Canadian federal and provincial taxes.

10.  General Unsecured Claims and Contingency Costs represent a provision for unknown additional expenses and obligations related to general unsecured claims, which are paid in full upon allowance, including, but not limited to, retained liabilities, associated legal costs, and additional time in Chapter 11, as well as Canadian unsecured claims in any Canadian ancillary proceedings.  General Unsecured Claims are net of liabilities expected to be assumed by the Purchaser in connection with the Asset Sale and trade payables expected to be paid by the Company during their Chapter 11 cases and in ancillary Canadian proceedings. These amounts are presently unknowable and, therefore, the actual costs and claims could be materially higher than the range presented, resulting in potentially reduced bondholder recoveries.

APPENDIX F

TO

DISCLOSURE STATEMENT
OF RUSSELL-STANLEY HOLDINGS, INC. AND ITS AFFILIATE DEBTORS

FINANCIAL INFORMATION FOR FISCAL YEAR
ENDING DECEMBER 31, 2004 AND PERIOD FROM JANUARY 1, 2005 THROUGH MAY 31, 2005

APPENDIX F

**AUDITED FINANCIAL INFORMATION FOR YEAR ENDING DECEMBER 31, 2004**

# *Russell-Stanley Holdings, Inc. and Subsidiaries*

*Financial Statements for the*
*Years Ended December 31, 2004, 2003 and 2002 and*
*Independent Auditors' Report*

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1 |
| FINANCIAL STATEMENTS AS OF DECEMBER 31, 2004 AND 2003 AND FOR EACH OF THE YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002: | |
| Consolidated Statements of Operations and Comprehensive Loss | 2 |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Stockholders' Equity (Deficit) | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6-25 |



**Deloitte & Touche LLP**
Two Hilton Court
Parsippany, NJ  07054-0319
USA

Tel:  +1 973 683 7000
Fax: +1 973 683 7459
www.deloitte.com

**INDEPENDENT AUDITORS' REPORT**

To the Board of Directors and Stockholders of
Russell-Stanley Holdings, Inc.:

We have audited the accompanying consolidated balance sheets of Russell-Stanley Holdings, Inc. and subsidiaries (the "Company") as of December 31, 2004 and 2003, and the related consolidated statements of operations and comprehensive loss, stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, at December 31, 2004 and 2003, the Company was not in compliance with certain covenants of its long-term loan agreement. The Company is seeking other sources of long-term financing. The Company's difficulties in meeting its loan agreement covenants and financing needs, its recurring losses from operations, and its negative working capital position discussed in Note 1 raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Deloitte & Touche LLP

July 13, 2005

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED STATEMENTS OF OPERATIONS AND
COMPREHENSIVE LOSS
YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002
(In thousands)**

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| NET SALES | $ 277,612 | $ 217,339 | $ 210,354 |
| COST OF SALES | 220,541 | 174,374 | 161,215 |
| GROSS PROFIT | 57,071 | 42,965 | 49,139 |
| OPERATING EXPENSES: |  |  |  |
| Selling | 24,400 | 20,523 | 18,632 |
| General and administrative | 22,827 | 18,900 | 21,246 |
| Goodwill impairment | - | 67,023 | - |
| Amortization of intangibles | 15 | 15 | 18 |
| Total expenses | 47,242 | 106,461 | 39,896 |
| INCOME (LOSS) FROM OPERATIONS | 9,829 | (63,496) | 9,243 |
| INTEREST EXPENSE | 10,216 | 9,208 | 7,496 |
| (LOSS) INCOME FROM CONTINUING OPERATIONS BEFORE TAXES | (387) | (72,704) | 1,747 |
| INCOME TAX EXPENSE (BENEFIT) | 346 | (11,298) | 700 |
| (LOSS) INCOME FROM CONTINUING OPERATIONS | (733) | (61,406) | 1,047 |
| DISCONTINUED OPERATIONS: |  |  |  |
| LOSS FROM DISCONTINUED OPERATIONS | (3,628) | (5,057) | (38,111) |
| INCOME TAX EXPENSE (BENEFIT) | - | 9,099 | (11,089) |
| NET LOSS FROM DISCONTINUED OPERATIONS | (3,628) | (14,156) | (27,022) |
| NET LOSS | (4,361) | (75,562) | (25,975) |
| OTHER COMPREHENSIVE INCOME (LOSS) | 127 | 3,287 | (285) |
| COMPREHENSIVE LOSS | $ (4,234) | $ (72,275) | $ (26,260) |

See notes to consolidated financial statements.

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2004 AND 2003**
**(In thousands)**

| ASSETS | 2004 | 2003 |
|---|---|---|
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 7,527 | $ 5,353 |
| Accounts receivable, less allowances of $519 and $355, respectively | 26,579 | 22,351 |
| Inventories—net | 25,955 | 17,134 |
| Prepaid taxes and income taxes receivable | 85 | 123 |
| Prepaid expenses and other current assets | 4,546 | 3,171 |
| Deferred tax benefit—net | 3,831 | 2,321 |
| Assets of discontinued operations | - | 5,967 |
| Total current assets | 68,523 | 56,420 |
| PROPERTY, PLANT, AND EQUIPMENT—Net | 60,691 | 68,264 |
| OTHER ASSETS | | |
| Other intangible assets—net | 371 | 417 |
| Other noncurrent assets | 197 | 248 |
| Restricted cash | 875 | - |
| Deferred tax benefit—net | 3,392 | 4,902 |
| Total other assets | 4,835 | 5,567 |
| TOTAL | $ 134,049 | $ 130,251 |

| LIABILITIES AND STOCKHOLDERS' DEFICIT | | |
|---|---|---|
| CURRENT LIABILITIES | | |
| Accounts payable and accrued expenses | $ 36,326 | $ 29,373 |
| Liabilities of discontinued operations | - | 1,951 |
| Income taxes payable | 17,696 | 17,052 |
| Current portion of long-term debt | 74,446 | 73,793 |
| Total current liabilities | 128,468 | 122,169 |
| LONG-TERM DEBT—Net of current portion | 26,212 | 23,980 |
| OTHER NONCURRENT LIABILITIES | 9,477 | 9,976 |
| Total liabilities | 164,157 | 156,125 |
| COMMITMENTS AND CONTINGENCIES | | |
| STOCKHOLDERS' DEFICIT | (30,108) | (25,874) |
| TOTAL | $ 134,049 | $ 130,251 |

See notes to consolidated financial statements.

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002**
**(In thousands, except share data)**

| | Common Stock Shares | Amount | Additional Paid-in Capital | (Accumulated Deficit) Retained Earnings | Cumulative Translation Adjustments | Accumulated Other Comprehensive Income (Loss) Unrecognized Net Pension Loss | Treasury Stock Shares | Amount | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|
| BALANCE—January 1, 2002 | 3,002 | $ 300 | $ 12,578 | $ 67,695 | $ (2,093) | $ (786) | 24,350 | $ (5,033) | $ 72,661 |
| Net loss | - | - | - | (25,975) | - | - | - | - | (25,975) |
| Minimum pension liability adjustment | - | - | - | - | - | (433) | - | - | (433) |
| Translation adjustment | - | - | - | - | 148 | - | - | - | 148 |
| BALANCE—December 31, 2002 | 3,002 | 300 | 12,578 | 41,720 | (1,945) | (1,219) | 24,350 | (5,033) | 46,401 |
| Net loss | - | - | - | (75,562) | - | - | - | - | (75,562) |
| Minimum pension liability adjustment | - | - | - | - | - | (321) | - | - | (321) |
| Forfeited common stock | (2) | - | - | - | - | - | - | - | - |
| Translation adjustment | - | - | - | - | 3,608 | - | - | - | 3,608 |
| BALANCE—December 31, 2003 | 3,000 | 300 | 12,578 | (33,842) | 1,663 | (1,540) | 24,350 | (5,033) | (25,874) |
| Net loss | - | - | - | (4,361) | - | - | - | - | (4,361) |
| Minimum pension liability adjustment | - | - | - | - | - | 33 | - | - | 33 |
| Translation adjustment | - | - | - | - | 94 | - | - | - | 94 |
| BALANCE—December 31, 2004 | 3,000 | $ 300 | $ 12,578 | $ (38,202) | $ 1,757 | $ (1,507) | 24,530 | $ (5,033) | $ (30,108) |

3,000 shares issued and outstanding at $0.10 a share
See notes to consolidated financial statements.

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002**
**(In thousands)**

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net (loss) income from continuing operations | $ (733) | $ (61,406) | $ 1,047 |
| Adjustments to reconcile net (loss) income to net | | | |
| cash provided by operating activities: | | | |
| Depreciation | 12,425 | 12,185 | 10,862 |
| Amortization of intangibles | 15 | 15 | 18 |
| Goodwill impairment | - | 67,023 | - |
| Deferred income taxes | - | (11,599) | (96) |
| Loss on disposal of fixed assets | - | 339 | - |
| Non-cash PIK interest | 2,232 | 2,041 | 1,869 |
| Changes in operating assets and liabilities: | | | |
| Increase in accounts receivable | (4,815) | (950) | (768) |
| (Increase) decrease in inventories | (9,608) | 5,275 | (3,951) |
| Increase in prepaids and other current assets | (1,029) | (169) | (984) |
| Increase (decrease) in accounts payable, accrued | | | |
| expenses and income taxes payable | 6,888 | (5,902) | 7,622 |
| Increase (decrease) in other—net | 384 | (89) | 191 |
| Net cash provided by continuing operations | 5,759 | 6,763 | 15,810 |
| Net cash (used in) provided by discontinued operations | (983) | (86) | 1,876 |
| Net cash provided by operating activities | 4,776 | 6,677 | 17,686 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Capital expenditures | (5,925) | (6,974) | (10,627) |
| Increase in restricted cash | (875) | - | - |
| Proceeds from sales of business units, net of selling costs | | | |
| and cash sold | 4,177 | - | - |
| Net cash used in investing activities by continuing operations | (2,623) | (6,974) | (10,627) |
| Net cash used in investing activities by discontinued operations | (311) | (1,690) | (2,074) |
| Net cash used in investing activities | (2,934) | (8,664) | (12,701) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Repayments of long-term borrowings | - | (4,000) | (1,000) |
| Borrowings under revolving credit facility | 751 | 28,257 | 49,628 |
| Repayments under revolving credit facility | - | (21,481) | (51,429) |
| Other | (27) | (25) | (22) |
| Net cash provided by (used in) financing activities | 724 | 2,751 | (2,823) |
| EFFECT OF EXCHANGE RATE CHANGES ON | | | |
| CASH AND CASH EQUIVALENTS | (392) | 1,024 | 148 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 2,174 | 1,788 | 2,310 |
| CASH AND CASH EQUIVALENTS—Beginning of year | 5,353 | 3,565 | 1,255 |
| CASH AND CASH EQUIVALENTS—End of year | $ 7,527 | $ 5,353 | $ 3,565 |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION: | | | |
| Cash paid during the year for: | | | |
| Interest | $ 7,700 | $ 7,580 | $ 5,662 |
| Income taxes | $ 134 | $ 990 | $ 251 |

See notes to consolidated financial statements.

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2004, 2003 AND 2002 (in thousands, except share data)**

1.    **NATURE OF BUSINESS**

*Organization*—Russell-Stanley Holdings, Inc. ("Holdings" or the "Company") is a leading manufacturer and marketer of plastic and steel industrial containers in North America. The Company's products are used in a broad range of industries including specialty chemical, petrochemical, agricultural chemical, electronic chemical, pharmaceutical, and food products. Its operating subsidiaries include Russell-Stanley Corp. ("RSC") and Hunter Drums Limited ("Hunter"). Its non-operating subsidiaries include Container Management Services, Inc. ("CMS") and New England Container Co., Inc. ("NEC").

The accompanying financial statements have been prepared assuming the Company will continue as a going concern.  As of December 31, 2004 and 2003, the Company was not in compliance with certain financial covenants and the Company's senior debt agreement expired on February 10, 2004, accordingly the senior debt has been classified as current in the accompanying financial statements. See Note 7 for additional information regarding Indebtedness.

As a result of the above factors and the company's existing debt structure, management and the Board of Directors have reviewed various financing and strategic alternatives. A discussed in Note 16, the Company has entered into a definitive agreement with RSH Acquisition Corp. ("Purchaser"), an affiliate of Mauser-Werke GmbH & Co. KG, whereby Purchaser would acquire substantially all of the assets of Holdings and its subsidiaries (excluding NEC and CMS) ("Asset Sale"). The Company contemplates using the proceeds of the Asset Sale to satisfy certain liabilities not assumed by the Purchaser, including the Company's existing Senior Credit Facility and a portion of its Senior Subordinated Notes.

The Company contemplates completing the Asset Sale pursuant to a prepackaged plan of reorganization or liquidation under Chapter 11 of the U.S. Bankruptcy Code.  As of December 31, 2004, the Company had not yet filed for protection under Chapter 11 of the U.S. Bankruptcy Code. The Asset Sale would exclude the cash of Holdings and its subsidiaries, the assets of NEC and CMS, the insurance policies of Holdings and its subsidiaries and the equity securities of Holdings and its subsidiaries (including NEC and CMS). The Asset Sale contemplates that the Purchaser would assume all payables of Holdings and its subsidiaries (excluding NEC and CMS) appearing on the closing balance sheet. The Asset Sale contemplates that the Purchaser would not assume any pre-closing liabilities of Holdings and its subsidiaries other than certain balance sheet liabilities of Holdings (including payables of Holdings), as well as the known environmental liabilities of Holdings and the unknown environmental claims arising from conditions existing on or prior to the closing at the real properties of Holdings.

The accompanying consolidated financial statements do not include any adjustments relating to the recoverability and classification of asset carrying amounts or the amount and classification of liabilities that might result should the Company be unable to continue as a going concern.

2.    **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation*—The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. The Company's continuing operations consist of RSC and Hunter, which manufacture and sell new plastic and steel rigid industrial containers. The consolidated financial statements also include the assets and liabilities and operating results of businesses held for sale, which amounts are separately classified as discontinued operations. These operations encompass NEC and CMS, which were ultimately disposed of in 2004. All significant intercompany accounts and transactions have been eliminated in consolidation.

*Revenue Recognition*—Revenue is recognized when products are shipped to customer and title passes, provided the following four basic criteria are met: (1) persuasive evidence of an arrangement exists; (2) product has been shipped; (3) the fee is established; and (4) collectibility is reasonably assured. Should changes in conditions cause management to determine revenue recognition criteria are not met for certain transactions, revenue recognition would be delayed until such time that the transactions become realizable and fully earned. Net sales reflects units shipped at negotiated selling prices reduced by volume rebate allowances and cash discounts.

*Use of Estimates*—The preparation of these consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Actual results could differ from those estimates. Estimates are used to a significant extent in determining the recoverability of intangibles from future operations and in establishing other valuation allowances.

*Cash Equivalents*—The Company considers all highly liquid investments purchased with an original maturity of three months or less to be cash equivalents and are valued at cost which approximates fair value.

*Restricted Cash*—The Company has restricted cash of $875 held in escrow by senior lenders from the sale of CMS.

*Inventories*—Inventories are stated at the lower of cost or market value. Cost is determined on the first-in, first-out (FIFO) method.

*Property, Plant and Equipment*—Property, plant and equipment, stated at cost, is depreciated for financial reporting purposes under the straight-line method over the estimated useful lives of the assets or the lease term, whichever is shorter. The estimated useful lives for each class of property, plant and equipment are as follows:

| | |
|---|---|
| Buildings and improvements | 15-30 years |
| Furniture and fixtures | 3-7 years |
| Machinery and equipment | 3-10 years |

*Long-Lived Assets and Assets to be Held for Sale*—In August 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standard ("SFAS") No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS No. 144") which addresses the financial accounting and reporting for the impairment or disposal of long-lived assets. SFAS No. 144 supersedes SFAS No. 121, *Accounting for the Impairment of Long-Lived Assets to be Disposed of* ("SFAS No. 121") and modifies the accounting and reporting provisions of Accounting Principles Board ("APB") Opinion No. 30, *Reporting the Results of Operations--Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions* ("APB 30"). SFAS No. 144 retains the requirements of SFAS No. 121 for evaluation and

recognition of impairment losses on long-lived assets to be held and used, but eliminates the requirement to allocate goodwill to the assets being tested for impairment. In addition, SFAS No. 144 provides additional guidance for implementing these impairment tests, including discussion on the use of probability-weighted cash flow estimation methods when alternative recovery methods may exist, and the establishment of a "primary asset" approach to determine the estimation period for groups of assets. In order to create a single accounting model, SFAS No.144 also provides specific guidance on accounting for disposals of long-lived assets. Long-lived assets to be disposed of other than by sale (e.g., through abandonment, exchange for similar productive asset, or in a distribution to owners in a spin-off) are to be considered held and used until disposed of, with impairment losses recognized at the disposal date. For long-lived assets to be disposed of by sale, SFAS No. 144 continues to require that assets classified as held for sale be reported at the lower of carrying amount or fair value, less costs to sell, with no further depreciation and amortization recorded subsequent to the decision to dispose of those assets.

SFAS No. 144 also provides for the presentation of discontinued operations when net assets held for sale relate to a component of an entity, for which results of operations and cash flows can be clearly distinguished, operationally and for financial reporting purposes, from the rest of the entity. A component of an entity held for sale or to be disposed of is presented as a discontinued operation if its operations and cash flows have been or will be eliminated from the ongoing operations of the entity and the entity will not have any significant continuing involvement in the operations of the component. Discontinued operations are no longer measured on a net realizable basis, and estimated future operating losses are no longer recognized before they occur. Refer to Note 13 for more information regarding the Company's accounting for discontinued operations.

*Derivatives*—The Company accounts for derivative transactions in accordance with SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("SFAS No. 133"), as amended by SFAS No. 137, *Accounting for Derivative Instruments and Hedging Activities—Deferral of the Effective Date of SFAS No. 133*, and SFAS No. 138, *Accounting for Certain Derivative Instruments and Certain Hedging Activities*, which establishes accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts and for hedging activities. All derivatives, whether designated in hedging relationships or not, are required to be recorded on the balance sheet at fair value. If the derivative is designated as a fair value hedge, the changes in the fair value of the derivative and the hedged item are recognized in earnings. If the derivative is designated as a cash flow hedge, changes in the fair value of the derivative are recorded in Other Comprehensive Income ("OCI") and are recognized in the income statement when the hedged item affects earnings. The Company had natural gas forward contracts that were not recorded on the balance sheet at December 31, 2003, as the agreements qualified for the normal purchase and sale exemption under SFAS No. 133. There were no such transactions in 2004.

*Other Intangible Assets*—Other intangible assets consist of pension assets (see Note 9) and patents. Patents are recorded at cost and are amortized over the life of the related assets (up to 17 years), using the straight-line method.

|  | Patents | |
|  | 2004 | 2003 |
| --- | --- | --- |
| Balance as of January 1, | $   58 | $   73 |
| Patents issued | 29 | - |
| Amortization | (15) | (15) |
| Balance as of December 31, | $   72 | $   58 |

Estimated amortization expense for 2005 – 2009 is $18 per year.

Management periodically evaluates the estimated useful lives of other intangible assets. For the three-year period ended December 31, 2004, there were no adjustments to the useful lives or the carrying values of other intangible assets.

*Goodwill*—In July 2001, the FASB issued SFAS No. 142, *Goodwill and Other Intangible Assets* ("SFAS No. 142"), which was adopted by the Company on January 1, 2002. SFAS No. 142 requires, among other things, the discontinuance of goodwill amortization. In addition, the standard includes provisions for the reclassification of certain existing recognized intangibles as goodwill, reassessment of the useful lives of existing recognized intangibles, reclassification of certain intangibles out of previously reported goodwill and the identification of reporting units for purposes of assessing potential future impairments of goodwill.

The Company evaluates the potential impairment of goodwill under the provisions of SFAS No. 142. The Company's reporting units are tested for impairment in December of each fiscal year once their annual forecasting process is complete. The fair value of the reporting units is estimated using the expected present value of future cash flows or the market approach, as relevant. As a result of the impairment analysis completed upon the adoption of SFAS No. 142, the Company recorded an impairment charge of $25.3 million for the write-off of the full amount of the goodwill associated with CMS and $9.7 million for the write-off of the full amount of the goodwill associated with NEC. These charges were recorded in 2002 as a component of the loss from discontinued operations in the accompanying consolidated statement of operations and comprehensive loss.

In 2003, the Company performed its annual impairment test and as a result of recurring losses, recorded additional impairment charges of $47.9 million for the write-off of the full amount of goodwill associated with RSC and $19.2 million for the write-off of the full amount of goodwill associated with Hunter. These charges were recorded as a component of the loss from continuing operations in the accompanying consolidated statement of operations and comprehensive loss.

The change in the carrying amount of goodwill for the year ended December 31, 2003 is as follows:

|  | Goodwill 2003 |
| --- | --- |
| Balance as of January 1, | $  63,515 |
| Translation adjustment | 3,508 |
| Impairment losses | (67,023) |
| Balance as of December 31, | $         - |

*Income Taxes*—Deferred tax assets and liabilities are recognized for the expected future tax consequences attributable to the difference between the financial statement carrying amounts of assets and liabilities and their respective tax basis. Management periodically evaluates the available evidence about future taxable income and other possible sources of realization of deferred tax assets and establishes valuation allowances, if necessary.

*Translation of Foreign Currencies*—The assets and liabilities of Hunter are translated into U.S. dollars at year-end exchange rates, with resulting translation gains and losses accumulated in a separate component of stockholders' equity. Income and expense items are converted into U.S. dollars at average rates of exchange prevailing throughout the year.

*Reclassifications*—Certain amounts in the prior year financial statements have been reclassified to conform to the current year's presentation.

***Recently Issued Accounting Standards***—In August 2001, the FASB issued SFAS No. 143, *Accounting for Asset Retirement Obligations* ("SFAS No. 143"). SFAS No. 143 establishes accounting standards for recognition and measurement of a liability for an asset retirement obligation and associated asset retirement cost. The Company adopted SFAS No. 143 on January 1, 2003, and the adoption of this statement did not have a material impact on the Company's consolidated financial statements.

In April 2002, the FASB issued SFAS No. 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections* ("SFAS No. 145"). SFAS No. 145 rescinds SFAS No. 4, *Reporting Gains and Losses from Extinguishment of Debt*, and an amendment of that Statement, SFAS No. 64, *Extinguishments of Debt Made to Satisfy Sinking-Fund Requirements*. Under Statement 4, all gains and losses from extinguishment of debt were required to be classified as an extraordinary item. Under SFAS No. 145, gains and losses from extinguishment of debt would be classified as extraordinary if they were unusual in nature and infrequent in occurrence. The provisions of this statement related to the rescission of Statement 4 shall be applied in fiscal years beginning after May 15, 2002, with early application encouraged. The Company adopted SFAS No. 145 on January 1, 2003 and the adoption of this statement did not have a material impact on the Company's consolidated financial statements.

In June 2002, the FASB issued SFAS No. 146, *Accounting for Costs Associated with Exit or Disposal Activities* ("SFAS No. 146"). SFAS No. 146 nullifies Emerging Issues Task Force ("EITF") Issue No. 94-3, *Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)*. SFAS No. 146 applies to the recognition and measurement of costs associated with an exit activity that does not involve an entity newly acquired in a business combination or with a disposal activity covered by SFAS No. 144. The Company adopted SFAS No. 146 on January 1, 2003 and the adoption of this statement did not have a material impact on the Company's consolidated financial statements.

In November 2002, the FASB issued Financial Interpretation Number ("FIN") 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness to Others*, an interpretation of FASB Statements No. 5, 57 and 107 and rescission of FASB Interpretation No. 34 ("FIN 45"). FIN 45 elaborates on the disclosures to be made by the guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued. The initial recognition and measurement provisions of FIN 45 are applicable on a prospective basis to guarantees issued or modified after December 31, 2002. The Company adopted FIN 45 on January 1, 2003 and the adoption of this statement did not have a material impact on the Company's financial position or results of operations.

In December 2002, the FASB issued SFAS No. 148, *Accounting for Stock-Based Compensation— Transition and Disclosure, an amendment of FASB Statement No. 123* ("SFAS No. 148"). SFAS No. 148 amends SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123"), to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. In addition, this statement amends the disclosure requirements of SFAS No. 123 to require prominent disclosures in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. The Company adopted SFAS No. 148 on January 1, 2003, and the adoption of this statement did not have a material impact on the Company's financial position or results of operations.

In December 2003, the FASB revised SFAS No. 132, *Employers' Disclosures about Pensions and Other Postretirement Benefits* ("SFAS No. 132 (R)"). SFAS No. 132 (R) retains the original disclosure provisions of SFAS No. 132 and adds new disclosures regarding plan assets, investment strategy, plan obligations and cash flows. SFAS No. 132 (R) is effective December 31, 2003. The Company has disclosed this additional information in Note 9.

In November 2004, the FASB issued SFAS No. 151, *Inventory Costs, an amendment of Accounting Research Bulletin No. 43, Chapter 4* ("SFAS No. 151"). SFAS No. 151 clarifies that abnormal amounts of idle facility expense, freight, handling costs, and wasted material (spoilage) should be expensed as incurred and not included in overhead. In addition, this statement requires that allocation of fixed production overheads to the costs of conversion be based on the normal capacity of the production facilities. The provisions of this statement are effective for inventory costs incurred during fiscal years beginning after June 15, 2005. The Company is in the process of determining the impact of adopting SFAS No. 151, if any.

In December 2004, the FASB issued SFAS No. 123 (R), *Share-Based Payment* ("SFAS No. 123(R)"), which requires recognition of compensation costs for stock options and other stock-based awards based on their fair value, generally measured as of the date of grant. Compensation cost will be recorded over the period that an employee provides service in exchange for the award. The provisions of this statement shall be effective for the Company in 2006. The adoption of SFAS No. 123 (R) is not expected to have a material impact on the consolidated financial statements of the Company.

In December 2004, the FASB issued SFAS No. 153, *Exchanges of Nonmonetary Assets, an amendment of Accounting Principles Board Opinion No. 29* ("SFAS No. 153"), which amends Opinion No. 29 to eliminate the exception for nonmonetary exchanges of similar productive assets and replaces it with a general exception for exchanges of nonmonetary assets that do not have commercial substance. A nonmonetary exchange has commercial substance if the future cash flows of the entity are expected to change significantly as a result of the exchange. The provisions of this statement shall be effective for exchanges occurring in fiscal periods beginning after June 15, 2005. The adoption of SFAS No. 153 is not expected to have a material impact on the consolidated financial statements of the Company.

***Accounting for Stock-Based Compensation***—The Company has elected, in accordance with the provisions of SFAS No. 123, as amended by SFAS No. 148, to apply the accounting rules under Auditing Practices Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations in accounting for employee stock-based compensation and, accordingly, has presented the pro forma disclosure-only information as required by SFAS No. 148.

The following table illustrates the effect on net loss if the Company had applied the fair value recognition provisions of SFAS No. 123 to stock-based employee compensation:

|  | Year Ended | | |
|  | 2004 | 2003 | 2002 |
| --- | --- | --- | --- |
| Net loss, as reported | $ (4,361) | $ (75,562) | $ (25,975) |
| Less total stock-based employee compensation expense determined under fair value based method, net of related tax effects | (22) | (22) | (21) |
| Pro forma net loss | $ (4,383) | $ (75,584) | $ (25,996) |

The fair value of each stock option grant is estimated on the date of grant using the Black–Scholes option pricing model.  In 2002, the weighted average assumption for the risk-free interest rate was 4.25% and the expected life in years was 5.00. There were no stock options granted in 2003 or 2004.

## 3. INVENTORIES

Inventory consists of the following:

|  | December 31, | |
|  | 2004 | 2003 |
| --- | --- | --- |
| Raw materials | $ 14,514 | $ 8,926 |
| Work-in-process | 6,048 | 2,281 |
| Finished goods | 5,393 | 5,927 |
| Total | $ 25,955 | $ 17,134 |

## 4. PROPERTY, PLANT, AND EQUIPMENT

Property, plant, and equipment consists of the following:

|  | December 31, | |
|  | 2004 | 2003 |
| --- | --- | --- |
| Land | $ 5,585 | $ 5,537 |
| Buildings and improvements | 17,737 | 17,081 |
| Machinery and equipment | 148,270 | 142,220 |
| Total | 171,592 | 164,838 |
| Less accumulated depreciation | (110,901) | (96,574) |
| Total | $ 60,691 | $ 68,264 |

## 5. LEASES

*Capital Leases*—Leased equipment included in machinery and equipment consists of the following:

|  | December 31, | |
|  | 2004 | 2003 |
| --- | --- | --- |
| Leased equipment | $ 94 | $ 94 |
| Less accumulated depreciation | (90) | (63) |
| Total | $ 4 | $ 31 |

Depreciation expense for the above capital leases amounted to $27, $25, and $25 in 2004, 2003, and 2002, respectively.

*Operating Leases*—The Company has operating lease commitments expiring at various dates, principally for real property, machinery and equipment, and transportation equipment. Total lease expense amounted to $4,935, $5,176, and $5,637 in 2004, 2003 and 2002, respectively.

Future minimum lease payments under the terms of the noncancelable capital lease and operating leases with initial or remaining terms in excess of one year at December 31, 2004 are as follows:

|  | Capital Lease | Operating Leases |
|---|---|---|
| 2005 | $ 4 | $ 4,532 |
| 2006 | - | 3,014 |
| 2007 | - | 2,234 |
| 2008 | - | 1,966 |
| 2009 | - | 1,915 |
| Thereafter | - | 4,337 |
| Total | $ 4 | $ 17,998 |

Accounts payable and accrued expenses and other noncurrent liabilities as of December 31, 2004, include $831 and $8,401, respectively, and as of December 31, 2003, $773 and $9,059 respectively, representing the net present value of future lease obligations related to the Company's Allentown facility, which was closed late in 2001. Annual cash obligations approximate $1.5 million per year through 2013 and are not included in the above table. See Note 15 to the consolidated financial statements describing the Company's lease at the Allentown facility.

**6.    ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

Accounts payable and accrued expenses consists of the following:

|  | December 31, | |
|---|---|---|
|  | 2004 | 2003 |
| Accounts payable | $ 21,832 | $ 16,327 |
| Accrued expenses - trade | 4,519 | 2,637 |
| Accrued payroll | 2,987 | 2,090 |
| Accrued interest payable | 221 | 203 |
| Allentown lease obligations | 831 | 773 |
| Other accrued expenses | 5,936 | 7,343 |
| Total | $ 36,326 | $ 29,373 |

## 7.    INDEBTEDNESS

Long-term debt consisted of the following:

| | Domestic Interest Rate | Interest Rate, December 31, 2004 | Balance, December 31, 2004 | Interest Rate, December 31, 2003 | Balance, December 31, 2003 |
|---|---|---|---|---|---|
| Revolving credit loan | Prime plus margin not less than 4.50% | 9.75 % | $ 14,446 | 8.50 % | $    7,520 |
| Revolving credit loan—Canadian | Canadian prime plus margin not less than 5.00% for 2003 | - | - | 9.50 | 6,273 |
| Term Loan B | Prime plus margin not less than 5.00% | 10.25 | 35,000 | 9.00 | 35,000 |
| Term Loan C | Prime plus margin not less than 5.50% for 2003, 5.00% for 2004 | 10.25 | 25,000 | 9.50 | 25,000 |
| Senior Subordinated Notes | Fixed rate—PIK | 9.00 | 26,212 | 9.00 | 23,980 |
| Total | | | 100,658 | | 97,773 |
| Less current portion | | | (74,446) | | (73,793) |
| Long-term portion | | | $ 26,212 | | $  23,980 |

As of December 31, 2004, the maturities of long-term debt are as follows: 2005 - $74,446; 2006 - $0; 2007 - $0; 2008 -$26,212; 2009 and thereafter - $0. Outstanding letters of credit were $2,675 and $3,455 at December 31, 2004 and 2003, respectively.

On November 16, 2001, the Company refinanced its outstanding senior debt by amending the debt to provide for a $30.0 million revolving credit line (including a $10.0 million Canadian credit line in U.S. dollars), a $40.0 million term loan ("Term Loan B"), and a $25.0 million term loan ("Term Loan C") (collectively, the "Senior Credit Facility"). In 2004, the Canadian credit line was converted from Canadian dollars to U.S. dollars. The Senior Credit Facility bears interest, at the Company's election, at a combination of domestic source and Eurodollar borrowing rates, which fluctuate based on the Company's Adjusted EBITDA (as defined by the Senior Credit Agreement) and debt levels. The Senior Credit Facility is secured by substantially all of the assets of the Company and its domestic subsidiaries. There were quarterly principal payments due under Term Loan B of $1.0 million per quarter, which commenced with the calendar quarter ending December 31, 2002 and ended with the calendar quarter ended December 31, 2003, pursuant to an agreement with the lenders.  There were quarterly payments due under Term Loan C, provided the Company attained certain stated cash flow levels, commencing with the calendar quarter ending December 31, 2002. No quarterly payments were made under this provision.

The Senior Credit Facility matured on April 15, 2004. Prior to maturity, the Company had not been in compliance with certain financial covenants of the Agreement since March 31, 2003 and had been in default of the Agreement since May 15, 2003.  The Company has continued to make interest payments under this Agreement and lenders have chosen not to accelerate the principal payments while the

- 14 -

company investigates alternative financing (see Note 16 for Subsequent Event matters). Due to a reduction in collateral from the sale of the assets of CMS, the lenders are holding $875 of the proceeds from that sale restricted in escrow which, is included in restricted cash on the Company's consolidated balance sheet at December 31, 2004.

In connection with the refinancing of the senior debt, the Company also issued $20.0 million of 9.0% Senior Subordinated Notes (the "Notes") due November 30, 2008. The Notes require quarterly interest payments in arrears, which commenced November 30, 2001. Interest was paid-in-kind ("PIK") until August 31, 2003. Interest accruing on or after August 31, 2003 shall be payable in cash, provided the Company attains certain stated Adjusted EBITDA levels. If interest accruing on or after August 31, 2003 is not paid in cash, such interest shall be paid in additional principal of new Notes pursuant to the PIK feature. The Company did not attain the stated Adjusted EBITDA levels, and interest paid on or after August 31, 2003 has been PIK. The Company is not in default of the bond indenture and the Notes remain classified as long-term debt. The Notes are subordinate to all existing and future senior indebtedness of the Company and are unconditionally guaranteed by the domestic subsidiaries.

## 8.   INCOME TAXES

The components of (loss) income from continuing operations before taxes are as follows:

|  | Year Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| U.S. | $ (965) | $ (54,312) | $ (931) |
| Foreign | 578 | (18,392) | 2,678 |
| Total | $ (387) | $ (72,704) | $ 1,747 |

The expense (benefit) for income taxes consists of the following:

|  | Year Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Federal income taxes: | | | |
| Current | - | - | - |
| Deferred | - | (9,071) | (115) |
| Total federal | - | (9,071) | (115) |
| State and local income taxes: | | | |
| Current | - | - | - |
| Deferred | - | (2,451) | (30) |
| Total state and local | - | (2,451) | (30) |
| Foreign income taxes: | | | |
| Current | 346 | 301 | 796 |
| Deferred | - | (77) | 49 |
| Total foreign | 346 | 224 | 845 |
| Total | $ 346 | $ (11,298) | $ 700 |

The components of the net deferred tax assets and liabilities as of December 31, 2004 and 2003 were as follows:

|  | 2004 | | 2003 | |
|  | Deferred Tax Assets | Deferred Tax Liabilities | Deferred Tax Assets | Deferred Tax Liabilities |
|---|---|---|---|---|
| Current: |  |  |  |  |
| Accounts receivable | $ 347 | $ - | $ 269 | $ - |
| Inventory | 2,682 | 471 | 1,586 | 472 |
| Accrued expenses | 1,273 | - | 938 | - |
| Total current | $ 4,302 | $ 471 | $ 2,793 | $ 472 |
| Noncurrent: |  |  |  |  |
| Property, plant and equipment | $ - | $ 8,839 | $ - | $ 8,263 |
| Goodwill | 6,262 | - | 7,053 | - |
| Allentown future lease obligations | 3,681 | - | 3,961 | - |
| Net operating loss | 18,854 | - | 10,993 | - |
| Valuation allowance | (14,475) | - | (6,649) | - |
| Other | 7 | 2,098 | 18 | 2,211 |
| Total noncurrent | $14,329 | $10,937 | $15,376 | $10,474 |

Deferred taxes principally result from different amortization periods of capital assets between financial reporting and income tax return purposes and accrued expenses which are deductible in different periods for financial reporting and income tax return purposes. The net deferred tax asset of $7,223 is expected to be utilized to offset the forgiveness of senior subordinated debt associated with the Asset Sale. See Note 1 for further details of the Asset Sale.

The difference between the effective income tax rate and the statutory federal income tax rate is explained as follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Federal statutory tax rate | (34.0)% | (34.0)% | 34.0 % |
| Goodwill impairment | - | 18.6 | - |
| State taxes, net of federal tax benefit | - | (4.3) | 3.2 |
| Travel and entertainment | 23.5 | 0.1 | 5.3 |
| Foreign tax rate differential | 38.5 | (0.1) | (3.8) |
| Other | 4.5 | (0.2) | 1.3 |
| Valuation allowance | 56.8 | 4.4 | - |
| Effective tax (benefit) rate | 89.3 % | (15.5)% | 40.0 % |

Income tax has not been provided on cumulative unrepatriated earnings from foreign subsidiaries, as it is the intention of the Company to permanently reinvest such foreign earnings in their operations. The amount of the deferred income tax liability associated with these earnings is impracticable to determine.

As of December 31, 2004, for Federal tax purposes, the Company had a total net operating loss carryforward of $152 million. Of that amount, the utilization of $91.3 million has been limited under Section 382 of the Internal Revenue Code pertaining to 2001 changes in ownership. The remaining $60 million is available to offset future income without limitations. The NOLs will expire at various years through the year 2024.

Since it is unlikely that the net operating losses generated through December 2003 will be fully utilized in the future, a valuation allowance of $6,649 has been established to reduce the potential income tax benefit of these NOLs. A full valuation allowance of $7,826 has also been recorded against the net operating losses generated in 2004.

During 2003, the Company recorded an impairment loss for goodwill on the books of RSC of $47,856 and HDL of $19,167. For tax purposes, the goodwill related to the 1997 Smurfit Plastic Packaging, Inc. acquisition in the amount of $27,124 will continue to amortize over the original 15-year period on a straight-line basis. A deferred tax asset and corresponding tax provision benefit of $6,262 and $7,053 was recorded to reflect this basis difference in goodwill in 2004 and 2003, respectively.

## 9.    RETIREMENT BENEFIT PLANS

The Company's non-union employees and certain union employees are eligible to participate in the Russell-Stanley Corp. 401(k) Savings and Retirement Plan (the "Plan"). As of January 1, 2001, all domestic employees were covered under this Plan. For salary employees, there is immediate eligibility. For hourly employees, eligibility in the Plan is dependent upon the attainment of age 21, as well as the completion of one year of service. Under the Plan, the Company matches 100% of each employee's contribution, up to 4%. In addition, the Company may contribute, at the discretion of the Board of Directors, an annual profit sharing contribution of 1% to 4.75% of each employee's salary, as defined, depending upon age. The participants' investments in the Plan are self-directed. The Company's total contributions expense for 2004, 2003 and 2002 was $1,079, $640 and $1,097 respectively.

The vesting period for the Company's match in the Plan is 20% after the first year and each year thereafter, until the participant becomes fully vested after five years. The vesting period for the Company's profit sharing contribution to the Plan is 60% after three years and 20% each year thereafter, until the participant becomes fully vested after five years.

The Company contributes to a defined benefit pension plan for certain union employees. At December 31, 2004 and 2003, respectively, assets of the plan consist of debt securities (69.3%, 62.6%), real estate (15.7%, 15.2%), equity securities (1.6%, 1.5%) and other investments (13.4%, 20.7%). The overall investment objective is to balance risk and return so that obligations to employees are met. The vesting period for the defined benefit pension plan is 20% after three years and each year thereafter, until the participant becomes fully vested after seven years. The Company expects to contribute $200 to the defined benefit pension plan in 2005.

Net pension cost for this defined benefit pension plan is as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Service cost - benefits earned during the period | $ 182 | $ 189 | $ 184 |
| Interest cost on projected benefit obligation | 210 | 208 | 194 |
| Expected return on plan assets | (155) | (223) | (191) |
| Prior service cost amortization | 59 | 59 | 59 |
| Loss amortization | 80 | 78 | 40 |
| Amortization of transition obligation | - | - | 13 |
| Net periodic pension cost | $ 376 | $ 311 | $ 299 |

Assumptions used in the accounting for the plan were:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Weighted-average discount rates | 6.10% | 6.10% | 6.50% |
| Expected long-term rate of return on assets | 6.00 | 8.50 | 8.50 |

The expected long-term rate of return for the plan's total assets is based on the expected return that the Massachusetts Mutual Life Insurance Company Contract will provide. The expected return is based on historical experience of investment income and dividends credited to the account.

The following table sets forth the funded status and amounts recognized for this defined benefit pension plan at December 31:

| | 2004 | 2003 |
|---|---|---|
| Total accumulated benefit obligation | $ 3,752 | $ 3,460 |
| Projected benefit obligation for service rendered to date | $ (3,752) | $ (3,460) |
| Plan assets at fair value | 2,680 | 2,576 |
| Projected benefit obligation in excess of plan assets | (1,072) | (884) |
| Prior service cost not yet recognized in net periodic pension cost | 298 | 357 |
| Unrecognized net loss | 1,507 | 1,540 |
| Adjustment to recognize minimum liability | (1,805) | (1,897) |
| Accrued pension cost | $ (1,072) | $ (884) |

The following table sets forth the change in benefit obligation and plan assets for this defined benefit pension plan at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Change in benefit obligation: |  |  |
| Benefit obligation—beginning of year | $ 3,460 | $ 3,135 |
| Service cost | 182 | 189 |
| Interest cost | 210 | 208 |
| Actuarial (gain) loss | (28) | 312 |
| Benefits paid | (72) | (384) |
| Benefit obligation—end of year | 3,752 | 3,460 |
| Change in plan assets: |  |  |
| Fair value of plan assets— beginning of plan year | 2,576 | 2,346 |
| Actual return on plan assets | 79 | 137 |
| Employer contributions | 97 | 477 |
| Benefits paid | (72) | (384) |
| Fair value of plan assets— end of year | 2,680 | 2,576 |
| Funded status | (1,072) | (884) |
| Unrecognized actuarial loss | 1,507 | 1,540 |
| Unrecognized prior service cost | 298 | 357 |
| Net amount recognized | $ 733 | $ 1,013 |
| Amounts recognized in the consolidated balance sheet consist of: |  |  |
| Accrued benefit liability | $ (1,072) | $ (884) |
| Intangible asset | 298 | 357 |
| Other comprehensive income | 1,507 | 1,540 |
| Net amount recognized | $ 733 | $ 1,013 |

Certain employees of Hunter are covered under a money purchase pension plan. Eligibility in the plan is dependent upon the completion of one year of service. Employees can contribute up to 3% of eligible income and executives can contribute up to 9% of eligible income, with a maximum yearly contribution of approximately $6. Hunter matches 100% of employee and executive contributions and these employer contributions vest after two full years as a member of the plan. Company contributions for the years ended December 31, 2004, 2003 and 2002 were $103, $92, and $87, respectively. The Company expects to contribute $100 to the money purchase pension plan in 2005.

10. **LONG-TERM INCENTIVE PLAN**

During 2000, the Company established a Long-Term Incentive Plan ("LTIP") for certain key employees for the two-year period ended December 31, 2002. Under the plan, 29,800 eligible units were awarded to the participants of the plan at a target value of $100 per unit. The final value of each unit was $43.31, as determined by the Company's achievement of certain Adjusted EBITDA levels, as defined, for the two-year period ended December 31, 2002. The Company recognizes expense in relation to this plan based on the estimate of the final payout of the plan for those participants meeting the eligibility requirements. The Company recognized expense of $365 for the year ended December 31, 2002. A one-time guaranteed payment of 25% of each participant's total award under the LTIP program was made to participants employed on March 15, 2002. This 25% payment offset the actual earned amount that was to be paid in March 2003, resulting in no payment due under the plan in 2003. A final payment of

approximately $414 was paid in 2004. This amount was included in current liabilities on the Company's consolidated balance sheet at December 31, 2003.

## 11.  COMMON STOCK

In 2002, the Company's shareholders approved and the Company adopted the Russell-Stanley Holdings, Inc. Stock Option Plan (the "Plan"). The provisions of the Plan allow the awarding of stock options to the Company's directors, executives, and certain employees. The maximum number of options that may be issued under the Plan during its term is 460,676 shares.

Under the terms of the Plan, stock options are granted at exercise prices set by the Compensation Committee of the Board of Directors, which are equal to the fair market value on the grant date. Options are 25% exercisable on the grant date, vesting an additional 25% on each anniversary of the grant date, until 100% exercisable on the third anniversary of the grant date. Options expire 10 years after the grant date. Additionally, to the extent that any of the 230,712 options allocated to certain executives are not granted prior to a change in control, the Compensation Committee shall grant such options to the executives who are still employed by the Company at the time of consummation of a transaction (as defined). These and all previously unvested options will vest at that time as well.

Additional information regarding this plan is as follows:

|  | 2004 | 2003 |
|---|---|---|
| Options outstanding, January 1 | 193,321 | 193,321 |
| Options forfeited | (57,774) | - |
| Options outstanding, December 31 | 135,547 | 193,321 |
| Options exercisable, December 31 | 111,839 | 96,661 |
| Weighted average exercise price of options outstanding | $   3.00 | $   3.00 |
| Weighted average exercise price of options forfeited | $   3.00 | $   - |
| Weighted average exercise price of options granted | $   - | $   - |
| Weighted average remaining contractual life | 7 years | 8 years |
| Weighted average exercise price of options exercisable | $   3.00 | $   3.00 |
| Weighted average fair value of options granted | $   - | $   - |

## 12.  COMMITMENTS AND CONTINGENCIES

The Company has entered into employment agreements with certain executives, whereby the Company is committed to provide severance and certain other benefits providing the employees comply with the provisions of said agreements. Payments totaling $1,000 and $694 were made in 2005 and 2004, respectively to certain executives pursuant to these agreements. The 2005 payments were accrued on the Company's consolidated balance sheet in Accounts payable and accrued expenses as of December 31, 2004.

By letter dated September 15, 1999, NEC was notified by the Environmental Protection Agency ("EPA") that NEC was a potentially responsible party at the Centredale Manor Restoration Project Superfund Site ("Site") in North Providence, Rhode Island. From approximately 1952-1971, NEC operated a drum reconditioning facility on a portion of the Site. This notice letter was issued by the EPA pursuant to the Federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA" or "Superfund"). The EPA has further alleged that NEC may have contributed to the presence of constituents of concern, including dioxin, in soil at residential properties and in stream sediment along the Woonasquatucket River adjacent to the Site. Four other potentially responsible parties ("PRPs") were also put on notice by the EPA, at or about the same time, concerning liability for environmental conditions associated with the Site. The EPA added the Site to the National Priorities List maintained pursuant to CERCLA in February 2000.

At present, the liability scheme under CERCLA renders a PRP jointly and severally liable, without regard to fault, for reasonable response costs incurred at a Superfund site consistent with regulatory requirements. The EPA also has authority, pursuant to CERCLA, to order parties to undertake response actions. All five PRPs responded to an initial Unilateral Administrative Order ("UAO") from the EPA, issued on April 12, 2000, pursuant to Section 106(a) of CERCLA, to install protective engineering controls designed to minimize exposure at the Site to dioxin-affected soils. The total costs for the initial UAO were approximately $118. The four performing PRPs shared these costs on an equal basis.

In January 2001, the EPA announced it was proceeding with an interim soil removal project and would be undertaking further testing and analysis to determine what, if any, remedial action in addition to the interim soil removal would be required. On March 26, 2001, the EPA issued a second UAO pursuant to Section 106(a) of CERCLA requiring NEC and the four other PRPs to perform the interim soil investigation and removal project, and to undertake repairs to Allendale Dam on the Woonasquatucket River. NEC worked with the EPA and three other PRPs pursuant to a scope of work approved by the EPA by letter dated July 25, 2001.

NEC and three other PRPs have been cooperating with the EPA in an effort to identify additional PRPs at the Site. On March 3, 2003, eleven additional PRPs received a General Notice Letter from the EPA concerning liability for environmental conditions associated with the Site. As part of this General Notice Letter, the EPA estimated that it had incurred past response costs of approximately $11,300 for actions, investigations, and oversight undertaken by the EPA at the Site. NEC's potential obligation is not probable and reasonably estimable. Accordingly, no provisions for the past response costs have been recorded.

In mid-November 2003, a depression was observed upstream of the sluice gate structure of the reconstructed dam. The EPA directed NEC and the other three PRPs performing the work under the second UAO, to evaluate this condition and options to stabilize the river-bottom sediments and to ensure that Allendale Dam is functioning properly. An environmental engineering firm was retained to address this condition. This work was incorporated into the second UAO, and all the work was completed for a total cost of approximately $2,273. The four performing PRPs shared these costs on an equal basis.

On September 11, 2003, the EPA entered into an Administrative Order on Consent ("Consent Order") with NEC and nine other PRPs to perform work relating to the control of storm water runoff and sedimentation in the former tailrace behind Centredale Manor and the construction and short-term maintenance of a drainage swale and protective cap over the tailrace area. This work was substantially completed for a total cost of approximately $482. A change order for additional fencing remains outstanding, but that work should not cost more than several thousand dollars. The nine new PRPs contributed a total of approximately $240 toward this work, and NEC and the other three performing PRPs shared the remaining costs on an equal basis.

The EPA published a new interim final Baseline Human Health Risk Assessment ("BHHRA") in October 2004 and an interim final Baseline Ecological Risk Assessment ("BESA") in December 2004. The BHHRA identifies the main contaminant of concern as dioxin and identifies that the greatest risks of human exposure results from consumption of fish from the river and dermal contact with river water. The BESA also identifies dioxin as the main contaminant of concern, and it identifies ecological risks to wildlife through contact with and consumption of contaminated water, soils, plants, and prey.

The EPA is currently proceeding with additional studies and investigations as part of a Remedial Investigation and Feasibility Study ("RI/FS") for the Site. This includes further sampling of sediments in portions of the Woonasquatucket River downstream from the Site. The RI/FS will be utilized by EPA in the selection of a long-term remedial response for the Site. EPA has proposed the use of a neutral mediator to facilitate discussions regarding the RI/FS amongst the various stakeholders. The mediator interviewed all of the stakeholders, and the EPA has advised the PRPs that a recommendation and a proposal is being developed for the EPA. The EPA also recently awarded a $50 Technical Assistance Grant to the Woonasquatucket River Watershed Council to help the group evaluate scientific information generated by the EPA's studies.

The EPA currently reports that it will issue a Record of Decision ("ROD") for the Centredale Manor Site in late 2005 or early 2006. It is not possible at this time to identify what the EPA's RI/FS findings will be or to determine the scope of further remediation that will be required by the EPA for the Site under the ROD. The EPA recently released a new draft guidance entitled "Contaminated Sediment Guidance for Hazardous Waste Sites" (January 2005), which emphasizes that at many sites a combination of sediment remediation methods may be appropriate. NEC and the other PRPs are monitoring this ongoing work by the EPA and may engage a technical consultant to assist in the review of the EPA technical information.

Although NEC no longer operates the facility, and did not operate the facility at the time the Company acquired the outstanding capital stock of NEC in July 1998, NEC has incurred, and will likely continue to incur, liability for this site under Federal and state environmental laws and could incur further liability because of the potential for civil litigation. The Federal Trustee for National Resource Damages claims has also been notified about environmental conditions at the Site. Any resulting liability is subject to, among other possible claims, a right of contribution from other PRPs and potential insurance reimbursements.

On August 31, 2001, the Company initiated suit against Mr. Vincent J. Buonanno, former owner of NEC, alleging claims of securities fraud, breach of warranty, rescission of the purchase agreement and a services agreement between the Company and Mr. Buonanno, breach of fiduciary duty, common law fraud, and breach of contract. This matter was settled in November 2003, including the release of all claims and counter-claims.

This Centredale Manor Restoration Site matter may result in liability to NEC that could have a material adverse effect on the NEC's financial condition, cash flows and results of operations. NEC incurred costs of $500 in 2004 and $726 in 2003 related to this matter.

The Company is also party to various claims, legal actions, complaints and union negotiations arising out of the ordinary course of business. Management proactively reviews and manages its exposure to, and the impact of, environmental matters and other contingencies. While it is possible that the Company's cash flows and results of operations in particular quarterly or annual periods could be affected by the one-time impacts of the resolution of the above contingencies, it is the opinion of management that the ultimate disposition of these matters, to the extent not previously provided for, will not have a material impact on the Company's financial condition or ongoing cash flows and results of operations.

**13.  DISCONTINUED OPERATIONS**

The Company intends to focus its future capital and resources on building its core manufacturing business segment, which sells new plastic and steel rigid industrial containers. Accordingly, in 2003 the Company made a strategic decision to exit its industrial container services business, comprised of NEC and CMS, which provided a variety of reconditioning services for both plastic and steel rigid industrial containers.

On May 1, 2003, the NEC Board of Directors approved the marketing and sale of the assets of NEC, including its three east coast facilities. On June 9, 2004, NEC reached an agreement with a purchaser for the sale of substantially all of the assets and certain liabilities of NEC. On July 30, 2004, NEC completed the sale for $4.3 million. From the proceeds the purchaser deposited $1.0 million to collateralize a letter of credit designed to indemnify the purchaser for potential future claims. The $1.0 million deposit was fully reserved for in the Company's consolidated balance sheet at December 31, 2004, as management does not anticipate recovery of the deposit.

On December 15, 2003, the CMS Board of Directors approved the marketing and sale or closure of the CMS business in South Carolina, including both its plant facilities. On May 26, 2004, CMS reached an agreement with a purchaser for the sale of certain assets of CMS. On June 8, 2004, CMS completed the sale for $1.5 million, of which $0.9 million is held in escrow by senior lenders. The remaining CMS business operations were shut down on September 30, 2004.

These businesses are reported as discontinued operations and the consolidated financial statements for all prior periods have been adjusted to reflect this presentation.

Summarized financial information for the discontinued operations follows:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Sales | $ 12,742 | $ 26,555 | $ 30,575 |
| Operating loss from discontinued operations before income taxes | (3,628) | (3,179) | (3,155) |
| Goodwill impairment | - | - | (34,956) |
| Loss on disposals of discontinued operations before income taxes | - | (1,878) | - |
| Loss from discontinued operations | (3,628) | (5,057) | (38,111) |
| Income tax expense (benefit) related to discontinued operations | - | 9,099 | (11,089) |
| Net loss from discontinued operations | $ (3,628) | $ (14,156) | $ (27,022) |

Net assets related to discontinued operations are recorded at their estimated net realizable value of $4.0 million including transaction costs as of December 31, 2003 and are reported as Assets and Liabilities of discontinued operations in the Company's consolidated balance sheet. The major classes of assets and liabilities of discontinued operations included in the consolidated balance sheet as of December 31, 2003 are as follows:

|  | **2003** |
|---|---|
| Cash | $    124 |
| Accounts receivable | 1,361 |
| Inventories | 1,249 |
| Plant, property & equipment | 3,233 |
| Total assets | 5,967 |
| Accounts payable and accrued expenses | (1,951) |
| Net assets | $  4,016 |

## 14.  FINANCIAL INSTRUMENTS AND RELATED DISCLOSURES

***Fair Value of Financial Instruments***—The Company does not enter into financial instruments for trading purposes. The carrying value of cash, cash equivalents, accounts receivable, accounts payable, and accrued expenses approximates their fair value due to the relatively short maturity of these financial instruments. The fair values of long-term debt are estimated based on the borrowing rates currently available for borrowings with similar terms and maturities. At December 31, 2004 and 2003, the carrying amount of debt approximated fair value based on borrowing rates in effect.

## 15.  RESTRUCTURING RESERVE

In 2001, the Company recorded nonrecurring charges of approximately $13.3 million relating to the adoption of a formal plan in 2001 to close its Allentown facility. These charges included a net present value accrual for lease and property tax obligations of approximately $10,500, with the lease set to expire in 2013.

The amounts reduced from this restructuring reserve during the years ended December 31, 2004 and 2003 were as follows:

|  | Lease, Property Taxes and Other |
|---|---|
| Liability—December 31, 2002 | $ 9,528 |
| Reserve adjustment | 703 |
| Cash payments | (399) |
| Liability—December 31, 2003 | 9,832 |
| Reserve adjustment | 116 |
| Cash payments | (716) |
| Liability—December 31, 2004 | $ 9,232 |

Included in lease, property taxes and other are operational shutdown costs, security costs and miscellaneous items. These items were under accrued at the time of the adoption of the plan.

## 16.  SUBSEQUENT EVENT

On May 10, 2005, the Company and certain of its wholly-owned subsidiaries entered into a definitive agreement with Russell-Stanley Holdings Acquisition Corp. (the "Purchaser"), an affiliate of Mauser-Werke GmbH & Co. KG, pursuant to which the Purchaser would acquire substantially all of the assets of Holdings and its subsidiaries (excluding NEC and CMS) (the "Asset Sale"). The Company contemplates completing the Asset Sale pursuant to a prepackaged plan of reorganization or liquidation under Chapter 11 of the U.S. Bankruptcy Code. The consummation of the Asset Sale is subject to certain closing conditions, including approval of the Company's plan of reorganization by the bankruptcy court.

* * * * * *

APPENDIX F

**NON-AUDITED FINANCIAL INFORMATION FOR THE**
**PERIOD FROM JANUARY 1, 2005 THROUGH MAY 31, 2005**

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED STATEMENTS OF OPERATIONS AND
COMPREHENSIVE LOSS
PERIOD ENDED May 31, 2005 and 2004
(In thousands)**

|  | 2005 | 2004 |
|---|---|---|
| NET SALES | $ 124,174 | $ 109,722 |
| COST OF SALES | 102,028 | 87,309 |
| Gross profit | 22,146 | 22,413 |
| OPERATING EXPENSES: |  |  |
| Selling | 9,689 | 9,806 |
| General and administrative | 11,543 | 10,019 |
| Amortization of intangibles | 7 | 6 |
| Total expenses | 21,239 | 19,831 |
| INCOME FROM CONTINUING OPERATIONS | 907 | 2,582 |
| INTEREST EXPENSE | 4,713 | 4,136 |
| LOSS FROM CONTINUING OPERATIONS BEFORE TAXES | (3,806) | (1,554) |
| INCOME TAX BENEFIT | (1,522) | (620) |
| LOSS FROM CONTINUING OPERATIONS | (2,284) | (934) |
| DISCONTINUED OPERATIONS: |  |  |
| LOSS FROM DISCONTINUED OPERATIONS | (109) | (718) |
| INCOME TAX BENEFIT | (43) | (288) |
| NET LOSS FROM DISCONTINUED OPERATIONS | (66) | (430) |
| NET LOSS | (2,350) | (1,364) |
| OTHER COMPREHENSIVE INCOME (LOSS) | 58 | (1,089) |
| COMPREHENSIVE (LOSS) | $ (2,292) | $ (2,453) |

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED BALANCE SHEETS**
**AS OF MAY 31, 2005 AND DECEMBER 31, 2004**
**(In thousands)**

| ASSETS | MAY 2005 | DEC 2004 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $ 10,128 | $ 7,527 |
| Accounts receivable | 26,963 | 26,579 |
| Inventories—net | 25,200 | 25,955 |
| Prepaid taxes and income taxes receivable | 85 | 85 |
| Prepaid expenses and other current assets | 4,604 | 4,546 |
| Deferred tax benefit—net | 3,831 | 3,831 |
| Total current assets | 70,811 | 68,523 |
| PROPERTY, PLANT, AND EQUIPMENT—Net | 57,743 | 60,691 |
| **OTHER ASSETS:** | | |
| Other intangible assets—net | 362 | 371 |
| Other noncurrent assets | 197 | 197 |
| Restricted cash | 875 | 875 |
| Deferred tax benefit - net | 3,558 | 3,392 |
| Total other assets | 4,992 | 4,835 |
| TOTAL ASSETS | $ 133,546 | $ 134,049 |

**LIABILITIES AND STOCKHOLDERS' DEFECIT**

| | MAY 2005 | DEC 2004 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts payable and accrued expenses | $ 37,362 | $ 36,326 |
| Income taxes payable | 16,056 | 17,696 |
| Current portion of long-term debt | 75,976 | 74,446 |
| Total current liabilities | 129,394 | 128,468 |
| LONG-TERM DEBT—Net of current portion | 27,405 | 26,212 |
| OTHER NONCURRENT LIABILITIES | 9,147 | 9,477 |
| Total liabilities | 165,946 | 164,157 |
| COMMITMENTS AND CONTINGENCIES | | |
| STOCKHOLDERS' DEFICIT | (32,400) | (30,108) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFECIT | $ 133,546 | $ 134,049 |

# RUSSELL-STANLEY HOLDINGS, INC. AND SUBSIDIARIES

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**AS OF MAY 31, 2005 and 2004**
**(In thousands)**

| | 2005 | 2004 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss from continuing operations | $ (2,284) | $ (934) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation | 4,843 | 5,263 |
| Amortization of intangibles | 7 | 6 |
| Deferred income taxes | | (1,472) |
| Noncash PIK interest | 1,193 | 539 |
| Changes in operating assets and liabilities: | | |
| Increase in accounts receivable | (622) | (8,174) |
| Decrease in inventories | 616 | 2,192 |
| Increase in prepaids and other current assets | (31) | (556) |
| (Decrease) increase in accounts payable, accrued expenses and income taxes payable | (774) | 7,473 |
| Increase (decrease) in other—net | 2 | (17) |
| Net cash provided by continuing operations | 2,950 | 4,320 |
| Net cash (used in) provided by discontinued operations | (69) | 28 |
| Net cash provided by operating activities | 2,881 | 4,348 |
| CASH FLOWS FROM INVESTING ACTIVITIES— | | |
| Capital expenditures of continuing operations | (2,186) | (1,726) |
| Capital expenditures of discontinued operations | | (311) |
| Net cash used in investing activities | (2,186) | (2,037) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Borrowings under revolving credit facility | 1,530 | 751 |
| Other—net | (4) | (11) |
| Net cash provided by (used in) financing activities | 1,526 | 740 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH AND CASH EQUIVALENTS | 380 | (310) |
| NET CHANGE IN CASH AND CASH EQUIVALENTS | 2,601 | 2,741 |
| CASH AND CASH EQUIVALENTS—Beginning of period | 7,527 | 5,353 |
| CASH AND CASH EQUIVALENTS—End of period | $ 10,128 | $ 8,094 |